# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 14, 2025

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| ADEL CYNOLTER, | * | |
| | * | |
| Petitioner, | * | No. 21-2008v |
| | * | |
| v. | * | Special Master Young |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * | | |

*Bryn E. Hazelwonder*, Whitfield & Eddy, PLC, Des Moines, IA, for Petitioner.
*Mary Eileen Holmes*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On January 30, 2024, Adel Cynolter ("Petitioner") filed a motion for attorneys' fees and costs, requesting **$24,771.11** for the work of her counsel. Pet'r's Mot., ECF No. 44. This amount consists of $19,269.00 in fees and $5,502.11 in costs, including $402.00 in costs incurred by Petitioner. *Id.* On February 27, 2024, Respondent filed his response to Petitioner's motion. Resp't's Response, ECF No. 46. In his response, Respondent stated his opposition, asserting that "[P]etitioner's application for any award for fees and costs should be denied for lack of reasonable basis." *Id.* at 1. Petitioner filed a reply brief on March 18, 2024. Pet'r's Reply, ECF No. 48. Petitioner's reply included an invoice for an additional $5,475.50 for fees incurred while preparing the reply to Respondent's objection, bringing the total amount of fees and costs requested to **$30,246.61**. *Id.*; *see also* Pet'r's Supplemental Br., ECF No. 49, filed Aug. 15, 2024. For the reasons stated below, I find that Petitioner's claim did have reasonable basis, and she is therefore entitled to fees and costs.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

I. **Procedural History**

The petition was filed *pro se* on October 12, 2021, by Beata Nasca on behalf of A.C., a minor. ECF No. 1. On December 28, 2021, Petitioner filed a motion in which she indicated that A.C. reached the age of majority. ECF No. 12. Accordingly, on January 19, 2022, I amended the case caption *sua sponte* to reflect Adel Cynolter as the Petitioner. ECF No. 14. On March 7, 2022, Petitioner's motion to substitute attorney Bryn E. Hazelwonder in place of Beata Nacsa was granted. *See* ECF No. 20; Clerk's Notice, docketed Mar. 7, 2022. On May 9, 2022, Petitioner filed medical records and a statement of completion. Pet'r's Exs. 1–18, ECF Nos. 27–28.

On January 9, 2023, Respondent filed his Rule 4(c) report arguing against compensation. ECF No. 33. Respondent stated Petitioner's Table anaphylaxis claim was unsupported by the medical record and should be dismissed. *Id.* at 6–7. On April 5, 2023, Petitioner filed an amended petition dropping the table claim and maintain her causation-in-fact claims. ECF No. 34.

On April 14, 2023, I ordered Petitioner to file an expert report within 60 days. ECF No. 37. Petitioner filed two motions for extension of time to file an expert report. ECF Nos. 38–39. In both motions, Petitioner indicated she had retained an expert. The parties filed a joint stipulation of dismissal on September 5, 2023, and on September 22, 2023, I entered an order concluding proceedings. ECF Nos. 40–41.

On January 30, 2024, Petitioner filed a motion for attorneys' fees and costs. Pet'r's Mot. Respondent filed a response objecting to Petitioner's motion on February 27, 2020. Resp't's Response. Petitioner filed a reply on March 18, 2024. Pet'r's Reply, ECF No. 48. This matter is now ripe for consideration.

II. **Medical History**

Petitioner was born on October 10, 2003. *See* Pet'r's Ex. 1. Her pre-vaccination medical history is significant for iron deficiency anemia. Pet'r's Ex. 3 at 2. Additionally, Petitioner suffered a pelvic fracture in 2016, after a fall, and subsequently complained of bilateral knee pain. Pet'r's Ex. 13 at 10. On August 8, 2019, Petitioner received a MCV vaccination at Jefferson County Public Health. Pet'r's Ex. 2 at 1. The next day, Petitioner presented for an immigration examination at Linn County Public Health. Pet'r's Ex. 3 at 23. Her examination was normal and unremarkable. *Id.*

On August 10, 2019, two days post-vaccination, Petitioner was seen in the emergency department ("ED") at University of Iowa Hospital with complaints of vaginal inflammation that started "last night" with soreness and swelling. Pet'r's Ex. 3 at 25. An examination revealed a groin rash with redness and pain. *Id.* There were no complaints of abdominal pain, fever, joint pain, shortness of breath, sore throat or vomiting. *Id.* Petitioner was diagnosed with a skin yeast infection, abrasion, and cellulitis, and was treated with pain reliever, antifungal topical cream, and started on a course of antibiotics. *Id.* at 26. Petitioner was prescribed additional pain medication and antibiotics upon ED discharge later that day. *Id.*

Petitioner's father called the University of Iowa Hospitals and Clinics nursing line the morning of August 12, 2019. Pet'r's Ex. 3 at 29. He requested "to have [Petitioner] come here for a [second] opinion, possible yeast infection, [inflammation] of outer lips with some abrasion, low grader fever 101.5." *Id*. Petitioner was seen in the obstetrics and gynecology clinic that afternoon. *Id.* at 31. She reported receiving her final Hepatitis B vaccine on August 6, 2019, and a meningococcal vaccine, three days later, on August 9, 2019. *Id.* That same evening, she developed a fever of 101 and was "hot and sweaty" while sleeping. *Id.* Petitioner's groin was irritated and she did not wear underwear the following day. *Id.* Petitioner reported her ED visit and stated that she had been taking the antibiotics and using the ointment prescribed at the hospital with no improvement of her symptoms. *Id.* Petitioner's vitals were normal, but her pelvic exam showed "[s]ignificant, diffuse erythema [and] swelling of left labia minora . . . [v]ery tender to palpation. [Three] small ulcerations with a dark red boarder noted on medial aspect of left labia minora with [three] symmetrical lesions on the medial aspect of the right labia minora." *Id.* at 33. *Id.* The assessment was labial swelling and ulcerations consistent with Lipschütz ulcers. *Id*. Her treaters recommended comfort measures, including peri and sitz bath rinses, over the counter pain medication, and topical lidocaine cream. *Id.*

At her follow-up appointment on August 19, 2019, Petitioner reported significant improvement and that her labial pain had resolved. *Id.* at 35. Her pelvic exam showed mild swelling of the left labia minora without tenderness and no sign of ulcers. *Id.* at 37. No further treatment was indicated. *Id.*

Approximately three weeks later, on September 11, 2019, Petitioner presented to her pediatrician with a three-week history of muscle pain in her back, neck, and side along with headaches. Pet'r's Ex. 3 at 39. She initially experienced soreness that she attributed to dance and exercise, but "the pain was constant and more limiting." *Id.* She stayed home from school in bed the week after Labor Day due to her symptoms, and "[t]he constant back/neck ache began to wane by the weekend." *Id.* The pain flared when she moved her neck and she started to experience jaw stiffness. *Id.* Petitioner also reported a tick bite "earlier in August or up to [two] months ago." *Id.* Dr. Jeschke, the resident pediatrician, noted "[t]he single etiology most likely to explain her symptoms is an overuse injury with an associated tension headache manifesting as she returned to school." *Id.* at 42. He also ordered laboratory studies to rule out Lyme's disease. *Id.* at 43. Petitioner's bloodwork showed elevated platelets and was positive for Lyme serology. *Id.* at 40–42. Additional testing for Epstein-Barr Virus ("EBV") was negative. *Id.* at 43. Petitioner's mother expressed concern that Petitioner's symptoms could be related to her recent meningococcal vaccination, but the pediatrician "discussed why this was unlikely." *Id.* Specifically, Petitioner's parents were told that other symptoms, including fatigue, malaise and local reactions "have been reported with Menactra, but not the symptoms that [Petitioner] is experiencing." *Id.* at 43. Confirmatory testing was positive on September 16, 2019, for Lyme serology, and Petitioner was directed to the ED for additional testing. *Id.* at 45. Petitioner's cerebrospinal fluid ("CSF") showed mildly elevated protein and platelets and a significantly elevated white blood cell count. *Id.* at 50–51. Petitioner was admitted and started on a course of intravenous antibiotics. *Id.* at 52. Further testing upon admission showed positive Keurnigs and Brudzinki signs indicating meningitis, but Petitioner was otherwise stable with normal vitals. *Id.* at 53. She improved overnight on antibiotics and was discharged the following day, on September 17, 2019. *Id.* Petitioner's diagnosis at discharge was Lyme meningitis, and she was

prescribed a fourteen-day course of doxycycline with directions to follow up with her pediatrician. *Id.* at 54–55.

Petitioner was readmitted to the same hospital on September 27, 2019, with concerns for recurrence of Lyme meningitis symptoms beginning earlier that day. Pet'r's Ex. 3 at 69. Petitioner reported generally doing well since her previous hospitalization until the appearance of spontaneous shoulder pain and headache earlier that day. *Id.* Petitioner described her headache as similar but less severe than the headache she presented with when diagnosed with Lyme meningitis. *Id.* Petitioner indicated that she had not missed any doses of her prescribed doxycycline course, which was not yet complete. *Id.* Examination revealed upper back pain and forward neck flexion pain. *Id.* at 71. Petitioner was readmitted and a repeat lumbar puncture was conducted. Petitioner was also started on intravenous antibiotics. *Id.* CSF results were reassuring and showed overall improvement from her mid-September results. *Id.* at 85–86. Petitioner was discharged on September 29, 2019, with a plan to continue her doxycycline course until October 3, 2019. *Id.* at 86.

On October 14, 2019, Petitioner had a follow-up appointment with her pediatrician. Pet'r's Ex. 3 at 95. Petitioner reported completing her antibiotic prescription and feeling better. *Id.* Her examination was overall normal apart from trace neck pain with forward flexion. *Id.* at 97. The plan was to follow up as needed and Petitioner was provided a letter for her school absences. *Id.*

Petitioner and her parents called her pediatrician on May 9, 2020, with concerns of possible recurrent Lyme manifestations and reported a one-week history of upper extremity swelling, tingling, numbness and redness with neck stiffness and dizziness. Pet'r's Ex. 3 at 111. Petitioner was directed to go to the ED and did so that day. *Id.* At the ED, Petitioner reported that her symptoms had seemed to resolve, and her bloodwork was unremarkable. *Id.* at 116. Despite her improvement, Petitioner and her mother expressed "concern that this may be a late manifestation of [] Lyme disease." *Id.* at 116. P.A. Pelman explained that "in the absence of any other systemic features, such as fever, . . . involvement of the central nervous system is very unlikely." *Id.* The impression was "arm swelling" and Petitioner was discharged that day with no treatment indicated. *Id.* at 116–17.

On May 28, 2020, Petitioner was seen at the hospital following general weakness and worsening joint pain following a bike ride. Pet'r's Ex. 3 at 119. Petitioner described elbow, forearm, left hip, knee and ankle pain. *Id.* She reported that the joints become hot and numb and the area surrounding her joints swells. *Id.* Despite resolution of symptoms following completed antibiotic course, her symptoms "have started back up again" following a reprieve two weeks following her last ED visit on May 9, 2020. *Id.* Her examination was normal, and her pediatrician noted that her ED bloodwork was reassuring but did not rule out possible Lyme sequelae. *Id.* at 122–23. Petitioner thereafter continued to see her pediatrician for routine and sick visits without further complaints related to her Lyme meningitis. *See e.g.*, *id.* at 127 (September 17, 2020 visit for pinworms), 135 (February 1, 2021 visit for coronavirus exposure), 145 (June 14, 2021 well child visit).

On June 25, 2021, Petitioner was seen for a gynecology appointment with complaints of labial changes from her resolved ulcerations. Pet'r's Ex. 13 at 394. On examination, Petitioner had asymmetrical but normal labial folds. *Id.* Her left labial fold was noted to be larger, and Petitioner reported that it caught on clothing. *Id.* Petitioner was provided information regarding labial reduction surgery for consideration. *Id.* No further treatment was indicated. *Id.*

### III.     Affidavits

In Petitioner's first affidavit, she described her state of health following her Lyme-meningitis diagnosis on September 11, 2019, approximately one month following her August 8, 2019 meningitis vaccination. Pet'r's Ex. 5 at 1−2. She stated that although she experienced some recovery she has "continued to experience headaches and muscle aches in [her] arm and back to a year after [her] diagnosis." *Id.* Petitioner added that the "whole experience did not feel like a sequence of multiple issues but one continued event that started [with] a meningitis shot on August 8, 2019." *Id.* at 2. In a second affidavit, Petitioner stated that her "symptoms were ongoing for more than six months." Pet'r's Ex. 19 at 1.

Petitioner' mother also submitted an affidavit, detailing Petitioner's disease progression. Pet'r's Ex. 6. She believed that her daughter was likely suffering from Lyme disease at the time of her meningitis vaccination that was then made worse, and "nearly took her life." *Id.* at 2. She did not discuss the length of time Petitioner suffered from her symptoms or if she continued to suffer at the time of the affidavit in 2021. *See id.* Petitioner's stepfather noted in his affidavit that "[i]t took a long time for [Petitioner] to recover fully. For months she was not the same." Pet'r's Ex. 7 at 2. He continued that two years later, she would "frequently, on an almost daily basis, stretch her neck and back and compress parts of her arms and shoulders expressing some subtle discomfort with her body." *Id.*

### IV.     Reasonable Basis Determination

#### a.  Standards of Review

To obtain attorneys' fees pursuant to a Vaccine Act claim, the petitioner must have a reasonable basis to support all elements of the claim for which the petition is brought, including causation. *Cottingham ex rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1345–46 (Fed. Cir. 2020) (citing 42 U.S.C. §§ 300aa11(c)(1), 300aa–15(e)(1)). An analysis of reasonable basis requires more than just a petitioner's belief in her claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6–7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. Sec'y of Health & Hum. Servs.,* 116 Fed. Cl. 276, 283 (2014). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham*, 971 F.3d at 1346 (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert and clarifying that "the failure to consider objective evidence presented in support of a reasonable basis for a claim would constitute an abuse of discretion"). Indeed, determining what constitutes "more than a mere scintilla" is a "daunting task." *Cottingham*

*v. Sec'y of Health & Hum. Servs.*, No. 15-1291V, 2021 WL 3085502, at *13 (Fed. Cl. Spec. Mstr. July 21, 2021).

While the Court in *Cottingham* did not purport to identify all forms of objective evidence reflective of reasonable basis, it stated that "objective medical evidence, including medical records . . . even where the records provide only circumstantial evidence of causation" can support a showing of reasonable basis. *Cottingham,* 971 F.3d at 1346 (citing *Harding v. Sec'y of Health & Hum. Servs.,* 146 Fed. Cl. 381, 403 (2019)). The *Cottingham* Court also reiterated that the reasonable basis determination is still based on a "totality of the circumstances." *Cottingham,* 971 F.3d at 1346.

In another recent opinion regarding reasonable basis, the Federal Circuit stated that medical records, affidavits, and sworn testimony all constitute objective evidence to support reasonable basis. *James-Cornelius v. Sec'y of Health & Hum. Servs.,* 984 F.3d 1374, 1379–81 (Fed. Cir. 2021). The Circuit further clarified that "absence of an express medical opinion on causation is not necessarily dispositive of whether a claim has reasonable basis." *Id.* at 1379 (citing *Cottingham*, 971 F.3d at 1346). When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.,* 138 Fed. Cl. 282, 289 (2018). This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.,* No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

Additionally, there may be reasonable basis at the time that a claim is filed, which then dissipates as the claim proceeds. *R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Hum. Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994) holding that "an award of fees and costs was not authorized for work performed on a case after a claim lost its reasonable basis"). If reasonable basis is lost, "[p]etitioners' counsels have an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven." *Cottingham v. Sec'y of Health & Hum. Servs.,* 134 Fed. Cl. 567, 574 (2017) (citing *Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Hum. Servs.,* 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Hum. Servs.,* 128 Fed. Cl. 724, 727 (2016)).

### b. Parties' Arguments

Petitioner's original application for fees and costs does not contemplate a reasonable basis objection. In response to Petitioner's application, Respondent challenged the reasonable basis of Petitioner's claim from the time it was filed through her application for fees. He argued that "Petitioner's claims relies solely on temporal proximity, which is not sufficient to establish reasonable basis." Resp't's Response at 6. Respondent further argued that Petitioner "has not provided objective evidence to support her claim that her alleged injuries lasted longer than six months." *Id.* at 7. Petitioner replied to Respondent's challenge by first identifying Respondent's three points of contention and then addressing them in turn.

First, Respondent argues that there is a lack of preponderant evidence to satisfy the Vaccine Act's severity requirement. Resp't's Response at 7. Second, Respondent argues that Petitioner's causation evidence is "patently insufficient," such that the Vaccine Act's causation requirements have not been satisfied. *Id.* at 8. Finally, Respondent argues that a reasonable basis never existed "at any time during the course of this litigation." *Id.* at 10.

### 1. Six-Month Severity Requirement

Petitioner argues that she "is not required to prove by a preponderance of the evidence that the Act's severity requirement was met to recover fees and costs." Pet'r's Reply at 8. She points to "objective evidence in both the medical records and Petitioner's affidavits that Petitioner suffered from a Lipschütz ulcer and Lyme meningitis." *Id.* at 9. Specifically, Petitioner referenced a doctor visit where she shared "concerns about labial changes that were a result of the Lipschütz ulcer over six months after receiving the vaccine." *Id.* (citing Pet'r's Ex. 3 at 149). Petitioner further cited a May 28, 2020 medical visit where she complained of "neck pain and swelling, including neck fullness and decreased range of motion, along with intermittent dizziness that was related to the post-vaccination diagnosis of Lyme meningitis." *Id.* (citing Pet'r's Ex. 3 at 111). These two medical records, Petitioner argues, provide objective evidence of Petitioner complaining of vaccine-caused injury more than six months post-vaccination.

### 2. Causation Requirement

Respondent argues that Petitioner failed to provide any objective evidence that her vaccination caused her alleged injury. Resp't's Response at 8. None of her medical providers attributed her injury to vaccination. *Id.* Furthermore, she was unable to provide a logical sequence of cause and effect demonstrating that the vaccine is the cause of her alleged injury. *Id.* at 9. Lastly, Respondent notes that "[P]etitioner's treating physicians unanimously associated her Lyme meningitis to a tick bite she consistently reported receiving in early August 2019." *Id.* The concerns that Petitioner and her mother shared with physicians about the potential causal role her vaccination played in Petitioner's condition "were repeatedly dismissed by [P]etitioner's doctors." *Id.*

Petitioner countered Respondent's arguments by asserting that petitions that are originally filed *pro se* (as is the case here) have a lower reasonable basis standard "in order to encourage competent counsel" to substitute in on these cases. Pet'r's Reply at 10 (citing *Foxx v. Sec'y of Health & Hum. Servs.*, No. 15-670V, 2016 WL 7785861, at *6 (Fed. Cl. Spec. Mstr. Dec. 21, 2016). Additionally, Petitioner argued that the novel theory of causation presented in this case: "that the meningococcal vaccination caused Lipschütz ulcers and Lyme meningitis," should be considered as the "Program encourages attorneys to pursue new scientific theories." *Id.* Petitioner's diagnoses occurred following her vaccination, and she argues that this chronology is more than a mere scintilla of evidence for reasonable basis to bring this claim. *Id.*

### 3. Reasonable Basis Requirement

In response to Respondent's assertion that Petitioner's claim never had a reasonable basis, she reiterates the reasons in support of reasonable basis that she has already articulated. She adds

that that counsel "diligently collected additional medical records an analyzed the records." Pet'r's Reply at 11–12. Petitioner responded to the Court's concern about the viability of the original anaphylaxis claim with a voluntary dismissal of that theory, and she filed an amended petition. *Id.* Petitioner noted that she attempted to acquire an expert to develop a theory of causation for her off-Table claim(s) but was unsuccessful and dismissed the case. *Id.* at 12. Petitioner argues that Respondent did not raise a reasonable basis objection at any point during the litigation of this case, despite expressed concerns about the viability of the Table claim. *Id.*

Petitioner also argued that there are important public policy considerations in allowing fees and costs to be awarded in cases that begin *pro se*. Pet'r's Reply at 17. She explained that "[b]y allowing attorneys to be compensated for their work when they step in for pro se petitioners, cases are resolved more efficiently and the system as a whole runs more smoothly." *Id.*

## V.     Reasonable Basis Analysis

Petitioner is correct that she is not required to establish that her claim would have been successful in order to recover attorneys' fees and costs. She argued that she met her obligation to provide more than a mere scintilla of objective evidence in support of her claim with medical records and affidavits. A review of the record in this case reveals clear objective evidence of Lipschütz ulcer and Lyme meningitis diagnoses following Petitioner's meningococcal vaccine. The question presented here is whether there is more than a mere scintilla of objective evidence of causation. *Stratton v. Sec'y of Health & Hum. Servs.*, 138 F.4th 1368, 1371 (Fed. Cir. 2025). Petitioner's initial petition requested compensation "for injuries including [a]naphylaxis and its mucosal manifestation as Lipschütz ulcer ([T]able injury) and Lyme meningitis (off-[T]able injury), resulting from the adverse effect of the [meningococcal] vaccination received on August 8, 2019." Pet. at 1. Petitioner does not assert that there is evidence of vaccine-caused anaphylaxis sufficient to meet the reasonable basis threshold. It follows that the Lipschütz ulcer injury (as an alleged result of the anaphylaxis) is insufficient evidence of causation to meet the reasonable basis threshold.

Petitioner also alleged that she suffered from Lyme meningitis that was caused-in-fact by her vaccination. A cursory review of Petitioner's medical records and her personal statements establish that she was vaccinated and shortly thereafter suffered a serious injury, namely meningitis, for more than six months. Claims of vaccine-caused meningitis have been resolved in Petitioner's favor a few times in past Program cases, although not alleged specifically and definitively as Lyme meningitis. *See, e.g.*, *Kapper v. Sec'y of Health & Hum. Servs.*, No. 17-1538V, 2021 WL 4865216 (Fed. Cl. Spec. Mstr. Aug. 30, 2021) (stipulation); *Choudry v. Sec'y of Health & Hum. Servs.*, No. 12-496V, 2014 WL 1877720 (Fed. Cl. Spec. Mstr. Apr. 17, 2014) (stipulation). A thorough reading of Petitioner's records reveals no evidence that any medical provider believed her symptoms post vaccination to be so caused. Indeed, there is evidence that her treaters on multiple occasions attempted to explain their conclusion that her Lyme meningitis was the result of a tick bite. Ultimately, consideration of the entire record does not reveal the type of evidence the Federal Circuit identified for reasonable basis in *Cottingham*. *Cottingham*, 971 F.3d at 1346 (finding that Petitioner's "medical records paired with the [vaccine's] package insert [] constitute at minimum circumstantial, objective evidence supporting causation," when the alleged symptoms match those specifically detailed in the packaging.) However, they also noted

that their enumeration was not exhaustive. The Federal Circuit was clear that reasonable basis may be evaluated case by case, and they recently reiterated that an "objective, totality of the circumstances test comports with [their] jurisprudence, [although] it is not required." *Sheller v. Sec'y of Health & Hum. Servs.*, 121 F.4th 1301, 1306 (Fed. Cir. 2024) (citing *Cottingham*, 971 F.3d at 1346). This case presents additional factors that illustrate the saliency of that discretion.

This petition was initially filed *pro se*. That is noteworthy because without counsel, petitioners are often not in a position to understand the legal thresholds they need to meet to bring and sustain a viable case. Additionally, as Petitioner noted, the Program is designed to encourage petitioners to seek counsel, and for counsel to assist petitioners such that claims can be fairly resolved as quickly as is reasonable. There is no doubt that Petitioner's case was voluntarily dismissed largely due to counsel's actions in seeking out the guidance of an expert who then declined to offer the necessary causation theory. It can be prohibitively difficult for *pro se* petitioners to obtain experts, particularly in cases with novel or rarely seen vaccine-injury associations. That can cause nonviable cases to drag on indefinitely while the petitioner is unable to appreciate that there is no path to entitlement. In this case, Petitioner's counsel seeks costs and fees to cover the costs of evaluating the strength of the case and subsequently dismissing it. This exercise is usually completed prior to the acceptance of a case. Here, perhaps Petitioner usurped that process by filing prematurely.

Petitioner's claim was further complicated due to the novelty of her allegations. Nonetheless, Petitioner's counsel appears to have taken up this case where it stalled and resolved it properly. Encouraging knowledgeable counsel to represent *pro se* filers benefits both the petitioner and the Program itself. Furthermore, the Circuit has cautioned that "[t]he first time an injury is causally linked with a vaccine [in the Program,] the petitioner might have weaker evidence [in support of a] medical theory . . . but that should not preclude a special master from finding a reasonable basis." *Sheller*, 121 F.4th at 1307. Practically, "an increase in the number of *pro se* petitioners would have a deleterious effect both inside and outside of the Vaccine Program. . . . Due to their lack of legal training, *pro se* petitioners require more attention from specials masters, assistant clerks in the Clerk's Office, and, probably, attorneys within the Department of Justice." *Hamrick*, 2007 WL 4793152, at *6. Petitioner has presented objective evidence of a vaccination, an alleged injury, and a temporal relationship between the two. Her claim is uncommon in the Program, and counsel sought an expert to make a reasonableness determination and develop a causation theory. There is also evidence in the record of an alternative cause for Petitioner's symptoms but given that Petitioner's initial petition alleged more than one vaccine-caused injury, it may be reasonable that there was more than a mere scintilla of evidence that supported a bacterial infection for one set of symptoms and vaccination for the other. It is in consideration of all of these facts and circumstances that I find that Petitioner is entitled to an award of fees and costs in this case.

A separate determination must be made regarding the total award amount of Petitioner's fees and costs. A notice of substitution of counsel was filed in this case on March 3, 2022, less than five months after the petition was initially filed *pro se*. Respondent then filed his Rule 4(c) report on January 9, 2023, and highlighted serious deficiencies in the case, which Petitioner sought to cure with an amended petition, filed on April 5, 2023. Petitioner also sought an extension of time to file an expert report, but ultimately, did not file any additional substantive evidence. The

9

dismissal stipulation in this case was filed on September 5, 2023, five months after the petition was amended and approximately one- and one-half years after Petitioner obtained counsel. There is no real explanation for this extended delay and that must be considered, even as the role that counsel played in resolving the case is acknowledged. That will be accounted for below.

## VI.  Reasonable Attorneys' Fees and Costs

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008). This is a two-step process. *Id.* First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id.* at 1347–48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. *Id.* at 1348.

A special master need not engage in a line-by-line analysis of Petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (2011). It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); *see also Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316–18 (2008). Such applications, however, should not include hours that are "'excessive, redundant, or otherwise unnecessary.'" *Saxton*, 3 F.3d at 1521 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum*, 465 U.S. at 895. The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895, n.11. Petitioners bear the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id.*

### a.  Hourly Rates

The decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The Court has since updated the *McCulloch* rates, and the Attorneys' Forum Hourly Rate Fee Schedules can be accessed online.[2]

---

[2] The OSM Fee Schedules are available at: http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch*, 2015 WL 5634323.

Petitioner requests the following rates for the work of her counsel: for Bryn Hazelwonder, $128.00 per hour for work performed in 2018,[3] $156.00 per hour for work performed in 2019, $175.00 per hour for work performed in 2020, $195.00 per hour for work performed in 2021, $220.00 per hour for work performed in 2022, $250.00 per hour for work performed in 2023, and $290.00 per hour for work performed in 2024; for Zach Hermsen, $195.00 per hour for work performed in 2018, $215.00 per hour for work performed in 2019, $255 per hour for work performed in 2020, $295.00 for work performed in 2021, $330.00 per hour for work performed in 2022, $350.00 per hour for work performed in 2023, $375.00 per hour for work performed in 2024.

I have reviewed the billing records submitted with Petitioner's request, and I find that the hourly rates billed for 2018 through 2024 for attorney and paralegal time are all reasonable and in accord with prior awards made by other special masters. Therefore, I will award these rates.

### b. Reasonable Number of Hours

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton*, 3 F.3d at 1521 (quoting *Hensley*, 461 U.S. at 434). It is well-established that billing for administrative or clerical tasks is not permitted in the Vaccine Program. *See e.g.*, *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989) (stating that services that are "primarily of a secretarial or clerical nature . . . should be considered as normal overhead office costs included within the attorneys' fee rates"); *see also Isom v. Sec'y of Health & Hum. Servs.*, No. 94-770, 2001 WL 101459, at *2 (Fed. Cl. Spec. Mstr. Jan. 17, 2001) (agreeing with Respondent that tasks such as filing and photocopying are subsumed under overhead expenses); *Walters v. Sec'y of Health & Hum. Servs.*, No. 15-1380V, 2022 WL 1077311, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2022) (failing to award fees for the review of CM/ECF notifications and the organization of the file); *McCulloch*, 2015 WL 5634323, at *26 (noting that clerical and secretarial tasks should not be billed at all, regardless of who performs them).

Petitioner requests $24,744.50 in attorneys' fees. Upon review of the submitted billing records, I find the time billed to be accurately representative of and consistent with the types of tasks that are typically awarded in the Program. However, for the reasons explained in part above and further below, I find a percentage reduction necessary.[4] Petitioner noted in her reply to Respondent's objection that after filing the notice of counsel substitution, counsel "immediately requested the outstanding medical records, filed the complete set of medical records once received, and reviewed and analyzed those records." Pet'r's Reply at 2. She continued that "[a]ll of those tasks were accomplished within approximately two months of [counsel] entering the case." *Id.* Petitioner then explained that "the case was on standby until Respondent filed his

---

[3] Ms. Hazelwonder was a law clerk in 2018. Pet'r's Mot. at 3 n.1.

[4] In reducing an award of fees, the goal is to achieve rough justice, and therefore a special master may take into account their overall sense of a case and may use estimates when reducing an award. *See Florence v. Sec'y of Health & Hum. Servs.*, No. 15-255V, 2016 WL 6459592, at *5 (Fed. Cl. Spec. Mstr. Oct. 6, 2016) (citing *Fox v. Vice*, 563 U.S. 826, 838 (2011)).

report." *Id.* Petitioner's notice of counsel was filed on March 3, 2022. ECF No. 21. Based on Petitioner's assertions, counsel had reviewed all of the evidence that was filed in this case by the first week of May. Indeed, Petitioner had reviewed and analyzed the same medical records that led to Respondent's conclusions in his Rule 4(c) report filed on January 9, 2023. However, Petitioner did not appreciate the insufficiency of evidence in the record for her Table claim at that time and only sought (rightly) to abandon it, without further argument, after Respondent's objection.

Furthermore, Petitioner stated that she was directed to obtain an expert report, which she was ultimately unable to do. This directive was the result of Petitioner's desire to continue with her off-Table claim. Successful claims for entitlement that are pursued off-Table require preponderant evidence of but-for causation. Without a sound and logical theory explaining how a petitioner's alleged injury was caused by a specific vaccine, there is no prima facie case for entitlement. As Respondent noted in his Rule 4(c) report, "[P]etitioner's treating physicians unanimously associated her Lyme meningitis to a tick bite she consistently reported receiving in early August 2019," and "concerns from [P]etitioner's parents about whether her MCV vaccination contributed to her condition were repeatedly dismissed by [P]etitioner's doctors." ECF No. 33 at 2. Instead of recognizing the weaknesses in her case immediately, particularly after they were identified by Respondent in his report, Petitioner chose to continue litigation for an additional eight months, until September 5, 2023. *See* ECF Nos. 33, 40. Petitioner credited Dr. Gershwin's decision not to provide an expert report as the deciding factor; however, the role of an attorney in these specialized cases, as Petitioner noted, is to provide "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Pet'r's Reply at 13. A reasoned analysis of the evidence in this case should have led an experienced attorney to dismissal in a timely manner prior to obtaining an expert. Thus, while Dr. Gershwin ultimately played a pivotal role in this case, his added opinion should have been unnecessary for an experienced attorney. I accept Petitioner's argument for the need of attorneys to take on *pro se* petitioners with novel vaccine-injury associations. The expectation remains that counsel will diligently and efficiently provide "zealous advocacy and competent representation" by reviewing the evidence in cases and facilitating the best course of action, expeditiously. *Id.* at 13.

Accordingly, I will reduce the attorneys' fees by 20%, or $4,948.90 to account for the undue delay in this case. Therefore, Petitioner is entitled to final attorneys' fees in the amount of $19,795.60.

### c. Costs

Like attorneys' fees, a request for reimbursement of attorneys' costs must be reasonable. *Perreira*, 27 Fed. Cl. at 34. Petitioner requests $5,100.11 in costs incurred by counsel, including obtaining medical records, an expert retainer fee from Dr. Gershwin, and $402.00 in the filing fee paid by Petitioner. I have reviewed the requested costs and find them to be largely reasonable. While Dr. Gershwin did not complete an expert report in this case, his review of the medical records and advice to counsel ultimately led to the decision to dismiss this case. Therefore, his $5,000.00 retainer should be paid. Accordingly, I will award $5,100.11 in costs incurred by Petitioner's counsel, and $402.00 in costs incurred by Petitioner.

### VII.  Conclusion

In accordance with the Vaccine Act, 42 U.S.C. §15(e) (2018), I have reviewed the billing records and costs in this case and finds that Petitioner's request for fees and costs is reasonable. Based on the above analysis, I find that it is reasonable to compensate Petitioner and her counsel as follows:

| | |
|---|---|
| Attorneys' Fees Requested | $24,744.50 |
| (Reduction to Fees) | $4,948.90 |
| **Attorneys' Fees Awarded** | **$19,795.60** |
| | |
| Attorneys' Costs Requested | $5,100.11 |
| (Reduction of Costs) | $0.00 |
| **Attorneys' Costs Awarded** | **$5,100.11** |
| | |
| **Attorneys' Fees and Costs** | **$24,895.71** |

| | |
|---|---|
| Petitioner's Costs Requested | $402.00 |
| (Reduction of Costs) | $0.00 |
| **Petitioner's Costs Awarded** | **$402.00** |

**Accordingly, I award a lump sum in the amount of $24,895.71, representing reimbursement for Petitioner's attorneys' fees and costs, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement. I also award a lump sum in the amount of $402.00, representing reimbursement for Petitioner's expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account to be reimbursed to Petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court **SHALL ENTER JUDGMENT** in accordance with the terms of the above Decision.[5]

      **IT IS SO ORDERED.**

s/Herbrina D. S. Young<br>
Herbrina D. S. Young<br>
Special Master

---

[5] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.